IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| J&J SPORTS PRODUCTIONS, INC, <br> as Broadcast Licensee of the May 2, 2015 <br> Floyd Mayweather, Jr. v. Manny Pacquiao <br> "The Fight of the Century" Championship Fight <br> Program, <br><br>     Plaintiff, <br><br> v. <br><br> JAMES E. KIRKPATRICK, individually, and d/b/a <br> ANCHOR UP, and d/b/a ANCHOR UP CLUB, and <br> d/b/a ANCHOR'S UP BAR, and d/b/a ANCHOR UP <br> ISLAND SHUTTLE, <br><br>     Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§    Civil Action No. 4:18-cv-00310-ALM<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## THIRD AMENDED JOINT FINAL PRETRIAL ORDER

This cause came before the court at a pre-trial management conference held on June

____, 2020, pursuant to Local Rule CV-16 and Rule 16 of the Federal Rules of Civil Procedure.

A.    COUNSEL FOR THE PARTIES

    (ii)    Party:       J&J Sports Productions, Inc. – Plaintiff
               Counsel:   David M. Diaz, Esq
               Address:   Law Offices of David Diaz, PLLC
                             825 Watters Creek Blvd.
                             Building M, Suite 250
                             Allen, Texas 75013
               Telephone: (972) 996-4588
               Email:      david@diazlawtx.com

    (ii)    Party:       James E. Kirkpatrick – Defendant
               Counsel:   Michael C. Wynne, Esq.
               Address:   Wʏɴɴᴇ & Sᴍɪᴛʜ
                             707 West Washington Street
                             P.O. Box 2228
                             Sherman, TX 75090
               Telephone: (903) 893-8177

Email:        mwynne@wynnesmithlaw.com

B.      STATEMENT OF JURISDICTION

This Court has jurisdiction over the parties in this action because Defendant resides in Texas, and for the reason that Plaintiff alleged that Defendant violated the Communications Act of 1934, as amended, 47 U.S.C. §§ 553 and 605 in Texas. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

C.      NATURE OF ACTION

PLAINTIFF:  This is an "Anti-Piracy" case involving the Federal Communications Act of 1934, as amended (the "Communications Act"). The Communications Act combats against the piracy of radio and television signals. *See* 47 U.S.C. §§ 553 or 605. In this case, Plaintiff alleges that Defendant violated the Communications Act of 1934, as amended, specifically 47 U.S.C. §§ 553 and 605, by intercepting, misappropriating, televising, divulging or otherwise exhibiting the closed-circuit telecast of the May 2, 2015 Floyd Mayweather, Jr. vs. Manny Pacquiao "The Fight of the Century" Championship Fight Program, including the undercard or preliminary bouts (the "Event"), and exhibiting the Event in Defendant's commercial establishment, Anchor's Up Bar also  known as Anchor Up Island Shuttle (the "Establishment"), without Plaintiff's authorization and without paying the appropriate commercial licensing fee to Plaintiff, who owned the exclusive license for such exhibition at commercial establishments.

DEFENDANT: Defendant denies he violated the Communications Act of 1934 or 47 U.S.C. §§553 and 605, by intercepting, misappropriating, television, divulging or exhibiting the closed circuit telecast of the May 2, 2015 Floyd Mayweather, Jr. vs. Manny Pacquiao "The Fight of the Century."

D.      CONTENTIONS OF THE PARTIES

PLAINTIFF:

1.      Plaintiff contends that Defendant violated the Communications Act of 1934, as amended, specifically 47 U.S.C. §§ 553 and 605 by intercepting, misappropriating, televising, divulging or otherwise exhibiting the closed-circuit telecast of the Event in Defendant's commercial establishment, without obtaining authorization or license from Plaintiff, who owned the exclusive license for such exhibition.

2.      Plaintiff contends the Communications Act is a strict liability statute.  *See e.g.*:

- *J&J Sports Productions, Inc. v. Bustillos*, 2018 U.S. Dist. LEXIS 203136, at *6 (S.D. Tex. Nov. 30, 2018) (Hoyt, J.) (47 U.S.C. § 605 is a "strict liability statute").

- *J&J Sports Productions, Inc. v. Bros. 5 Entm't Grp. LLC*, 2018 U.S. Dist. LEXIS 169404, at *6 (S.D. Tex. Sep. 28, 2018) (Hittner, J.) ("The FCA is a strict liability statute, meaning the plaintiff, as exclusive licensee, only needs to show that the satellite transmission was broadcast in the defendant's establishment without the plaintiff's authorization.").

- *J&J Sports Productions, Inc. v. Roli's Auto Sales, Inc.*, 2016 U.S. Lexis 170622, at*4 (S.D. Tex. Nov. 10, 2016) (Morgan, Mag.) ("On its face, the FCA [Federal Communications Act] is a strict liability [*8] statute.").

- *Joe Hand Promotions, Inc. v. Texas 411 Corporation*, *Order* [Doc. 31], at p. 7-9 (S.D. Tex. Dec. 13, 2012) (Hittner, J.) ["In relation to civil liability, the FCA is a strict liability statute, meaning that Joe Hand, as licensee, need only show that Defendants showed the Event at Copa Cabana without authorization... because the FCA is a strict liability statute, courts have recognized that any access of a protected communication, without proper authorization is violation. Therefore, Defendants' contention that the broadcast was accessed for free via the internet is of no legal import.''].

- *J&J Sports Productions, Inc. v. Orellana*, 2012 U.S. Dist. LEXIS 108084, at *13 (S.D. Tex. August 2, 2012) (Harmon, J.) ("The FCA is a strict liability statute, so a plaintiff, as exclusive licensee, need only show that the Event was shown in the defendant's establishment without the plaintiff's authorization.");

- *Joe Hand Promotions, Inc. v. Lee*, 2012 U.S. Dist. LEXIS 73094 at *7 (S.D. Tex. May 24, 2012) (Hoyt, J.) ("The Communications Act is a strict liability statute. … As a strict liability statute, to prove a violation, the plaintiff need only show that the Event was shown in defendant's establishment without the plaintiff's authorization. *See* 47 U.S.C. § 605; *Garden City Boxing Club, Inc. v. Vinson*, No. 3:03-CV-0700-BD(P), 2003 U.S. Dist. LEXIS 26180, at *6 (N.D. Tex. Sept. 3, 2003) ("The fact that the defendant may have purchased and lawfully received the Lewis-Tyson fight from DirecTV does not immunize her from liability for then broadcasting the event to patrons at her bar without obtaining authorization from the plaintiff, the exclusive licensee.").

- *Joe Hand Promotions, Inc. v. Macias*, 2012 U.S. Dist. LEXIS 36413, at *4 (S.D. Tex. Mar.19, 2012) (Atlas, J.) ("The FCA is a strict liability statute, and the plaintiff is required only to prove the unauthorized exhibition of the intercepted transmission.").

3.      Plaintiff contends that Defendant's knowledge and willfulness related to the violation of the Communications Act is not relevant as to Defendant's liability for violating the Communications Act. *See*:

- *That's Entertainment, Inc. v. J.P.T., Inc.*, 843 F. Supp. 995, 999 (D. Md. 1993) (If the Event was on Defendants' televisions, and Defendant does not have a commercial license from KingVision, the Defendant loses… "Nor is it relevant under the Act whether defendant's unauthorized acts were willful or knowing").

- *Garden City Boxing Club, Inc. v. Vinson*, 2003 U.S. Dist. LEXIS 26180, at *8 fn. 2 (N.D. Tex. Sept. 3, 2003) ("Plaintiff need not prove that defendant engaged in willful or knowing conduct in order to establish liability under section 605(a) of the FCA.").

- *KingVision Pay-Per-View, Ltd. v. Williams*, 1 F. Supp. 2d 1481, 1485 (S.D. Ga. 1998) (knowledge of violation relates to damages and not liability).

- *Top Rank v. Gutierrez*, 236 F. Supp. 637, 648-49 (W.D. Tex. 2001 ("As to defendant's argument that they lacked knowledge about the residential nature of the cable account… the statute [§ 553] does not require a knowing violation.").

4.      Plaintiff contends that the payment of a residential license fee to a third-party cable or satellite provider to broadcast an event in a commercial establishment is an automatic violation of the Communications Act.  *See, e.g.*:

- *Garden City Boxing Club, Inc. v. Vinson*, No. 3:03-CV-0700-BD(P), 2003 U.S. Dist. LEXIS 26180 (N.D. Tex. Sept. 3, 2003) ("Defendant does not dispute that she broadcast the Lewis-Tyson fight to approximately 40 patrons at The Red Dog Saloon on June 8, 2002 without paying a licensing fee.  Nevertheless, defendant maintains that her conduct did not violate section 605(a) because (1) she purchased the right to broadcast the fight from DirecTV; and (2) she did not charge an admission fee to her customers. (See Def. MSJ Resp. at 4).  Both arguments are without merit.  The fact that defendant may have purchased and lawfully received the Lewis-Tyson fight from DirecTV does not immunize her from liability for then broadcasting the event to patrons at her bar without obtaining authorization from plaintiff, the exclusive licensee." *See, e.g.*, *KingVision Pay-Per-View, Ltd. v. Williams*, 1 F. Supp. 2d 1481, 1484 (S.D. Ga. 1998); *KingVision Pay-Per-View, Ltd. v. Julian Corp.*, 1996 U.S. Dist. LEXIS 12539, 1996 WL 496600 at *2 (N.D. Ill Aug. 29, 1996); *That's Entertainment, Inc. v. J.P.T., Inc.*, 843 F. Supp. 2d 995, 999-1000 (D. Md. 1993); *See also*, *National Satellite Sports, Inc. v. Eliadis, Inc.*, 65 F. Supp.

2d 662, 228-69 (N.D. Ohio 1999) *aff'd*, 253 F.3d 900 (6th Cir. 2001), *cert. denied sub nom*, *Time Warner Entertainment, L.P. v. National Satellite Sports, Inc.*, 534 U.S. 1156, 151 L.Ed.2d 1019, 122 S.Ct. 1127 (2002).

- *Setanta Sports N. Am., Ltd. v. Giannakopoulos*, 2008 U.S. Dist. LEXIS 50716, at \*12-13 (S.D. Tex. June 25, 2008) (finding a violation of section 605 where a bar owner purchased an event through his residential cable account and broadcast it to 60 patrons at his bar, and stating that the authorization did not extend to exhibitions at commercial establishments").

*See also*:

- *KingVision Pay-Per-View, Ltd. v. Williams*, 1 F. Supp. 2d 1481, 1485 (S.D. Ga. 1998) (Demonstrating the strict liability nature of the Communications Act in a situation where the establishment "unknowingly" ordered a fight through a residential account rather than a commercial account, the Court held, "The undisputed facts show that Williams [Defendant] displayed the Frank Bruno versus Mike Tyson boxing match to approximately twenty-five of her establishment's patrons without contractual authorization from KingVision or its agents.  These facts show that Williams violated § 605 of the Cable Act, and thus summary judgment as to her liability is appropriate.");

- *National Satellite Sports, Inc. v. Eliads, Inc. d/b/a Melody Lane Lounge*, 253 F.3d 900, 916-917 (6th Cir. 2001) ("Even assuming, as the defendants contend, that there was no 'interception' here because [the bar] was 'authorized' by [the residential distributor] to receive the Event of a pay-per-view basis, defendants still have violated the Act because they clearly were not authorized to then broadcast the Event to the patrons of a commercial establishment such as [the bar] ….  The first and third sentences of [§ 605] do not … require an 'interception' of a cable transmission and clearly proscribe the unauthorized divulgence or use of communications which have been 'received' legally for certain purposes.").

5. Plaintiff contends that authorization from anyone else other than Plaintiff is not authorization. Any and every unauthorized showing of a pay-per-view event is a violation of the Communications Act.  *See*:

- *Joe Hand Promotions, Inc. v. Texas 411 Corporation, Order* [Doc. No. 31], at p. 4, 8-9 (S.D. Tex. December 13, 2012) (Hittner, J.) ("Defendants do not deny that the Event was shown at Copa Cabana, they contend that they did not illegally access the Event… Defendants contend that they cannot be held liable under the FCA because they did not illegally obtain the Event but that it was either obtained from an internet website for free… First, because the FCA is a strict liability statute, courts have

recognized that any access of a protected communication, without the proper authorization is a violation. Therefore, Defendants' contention that the broadcast was accessed for free via the internet is of no legal import… Even assuming that Defendants did stream the video live from the internet, it is common knowledge that downloading or streaming materials from the internet does not ensure that the downloaded or streamed media is legally obtained.");

- *Nat'l Satellite Sports, Inc. v. Garcia*, 2003 U.S. Dist. LEXIS 10315, at *3 n.2 (N.D. Tex. June 18, 2003) (Fitzwater, J.) ("A tape-delayed broadcast without authorization is still a violation of the FCA."); and

- *J&J Sports Productions, Inc. v. Orellana*, 2012 U.S. Dist. LEXIS 108084, at *13 (S.D. Tex. August 2, 2012) (Harmon, J.) ("Any unauthorized showing of the Event is a violation of the Communications Act.").

6.  Plaintiff contends that as the owner of the Establishment, Defendant had a right and ability to control the activities of the Establishment and a direct financial interest in the activities of the Establishment which is sufficient to find Defendant liable under the Communications Act.  *See*:

- *Joe Hand Promotions, Inc. v. Canales*, 2017 U.S. Dist. LEXIS 186606, at *10 (S.D. Tex. June 13, 2017) (Alvarez, J.):

    Defendant's violation was also made "for purposes of direct or indirect commercial advantage or private financial gain." Perhaps the most obvious evidence that Defendant's purpose was commercial advantage or private gain is the fact that the unlawful airing took place at his bar, where any reasonable bar owner could expect his business to do better by airing high-profile fights. Defendant has not offered, and the Court cannot conceive, of any alternative purpose behind the airing.

    47 U.S.C. §§ 553(c)(3)(B) and 605(e)(3)(C)(ii).  *See also* Cable Communications Policy Act, P.L. 98-549, 5 U.S. Cong. News, '84 Bd. Vol.-8, 4745, 4750 ("[i]t is further intended that the term 'direct or indirect commercial advantage or private financial gain' be interpreted broadly by both the courts in deciding actions.  Those who willfully violate subsection (a) and directly or indirectly enjoy commercial gain from those violations, may be reached."); *Joe Hand Promotions, Inc. v. Salinas*, Civil Action No. 2:11-cv-00050-AM-CW, Report and Recommendation [Doc. 20] at 9 (W.D. Tex. Dec. 12, 2012) (White, Mag.):It is also sufficiently clear that the event was broadcast in an

attempt to bring in customers to increase profits at his commercial business. By offering a free viewing of a program that would otherwise cost money if viewed privately in one's home, [Defendant] likely enticed some of the patrons into his lounge to create business or offered regular patrons incentives not to leave. Even if [Defendant] did not explicitly advertise the event, a customer would nonetheless be enticed to stay longer and spend more money than he or she otherwise would have spent had the event not been broadcast.

*J&J Sports Prods. v. El 33, LLC*, 2013 U.S. Dist. LEXIS 8006, at *14 (W.D. Tex. Jan. 14, 2013) (Cardone, J.) ("The evidence indicates that Defendants did exhibit the Event for the purpose of their own financial gain, because Defendants' waiters served food and drinks to approximately 110 patrons while the Event was displayed on several televisions throughout the Establishment."); *See generally, J&J Sports Prods. v. Beck*, 2013 U.S. Dist. LEXIS 146389 (S.D. Tex. Oct. 9, 2013) (Kazen, J.) ("[I]t is obvious that commercial establishments show sports programs to draw business, not out of charity"); *J&J Sports Prods. v. Papagallos 1, Inc.*, 2009 U.S. Dist. LEXIS 133109, at *8-9 (W.D. Tex. Apr. 16, 2009) (W.D. Tex. April 17, 2009) (Sparks, J.) ("The undisputed evidence establishes the Event was broadcast to paying customers of Defendant's commercial establishment and thus the violation was for commercial advantage or private gain."); *Kingvision Pay-Per-View, Ltd. v. Gutierrez* , 544 F. Supp. 2d 1179, 1185 (D. Colo. 2008) (Event encouraged patrons to prolong their stay and consume food and beverages); *Garden City Boxing Club, Inc. v. Huesca*, 2007 U.S. Dist. LEXIS 97176 at *12 (E.D.N.Y. Dec. 4, 2007) ("Defendants who intercept signals and broadcast programming without authorization 'in a place of business where certain events are shown to the public' are generally held to have acted willfully and for purposes of commercial advantage."); *Garden City Boxing Club, Inc, v. Guzman*, 2005 U.S. Dist. Lexis 7954, at * 9 (S.D.N.Y. April 26, 2005) ("[The exhibition of the fight undoubtly generated commercial profits for the defendant."); *KingVision Pay-Per-View, Ltd. v. Hay Caramba Mexican Rest.*, Civil Action No. H-02-1311 (S.D. Tex. March 10, 2003) (Hoyt, J.) *Memorandum and Order* (Doc. 14) ("It is the Court's view that the defendant profited even if it did not charge a cover by selling food and beverages to the patrons who expected and

did view the broadcast."); *Time Warner Cable v. Dockins*, 1998 U.S. Dist. LEXIS 22689 at *13 (S.D.N.Y. Sept. 4, 1998) ("[One of] the two most typical uses of pirated programming in commercial settings...involves the use of...pay-per-view and sporting events, by a bar or restaurant to attract customers, but without charging them for the service...Such an operation reflects an attempt by the violator to obtain ' commercial advantage ,' in the sense that the establishment seeks to attract patrons from competitors by including the televised event as an added attraction."); *Kingvision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001) ("In this case, it would not be fair to Kingvision to limit the award on the basis of the defendants' decision not to impose a cover charge, since Jasper Grocery likely profited from the purchase of food made by each customer attracted to the store by the prospect of watching the fight" . . . "And there can be little doubt that the defendants were motivated by profit in showing the fight. While Jasper Grocery apparently did not advertise the event, it clearly used the fight to draw potential customers who would then spend money inside the store. Under these circumstances, enhanced damages of an additional $10,000 are appropriate.").

7.     Plaintiff contends that the exhibition of the Event in a commercial establishment licensed by the TABC, such as Defendant's Establishment, makes Defendant liable as a matter of law. *See Joe Hand Promotions, Inc. v. Texas 411 Corporation, Order* [Doc. 31] (S.D. Tex. Dec. 13, 2012) (Hittner, J.) at p. 9; *Joe Hand Promotions, Inc. v. 152 Bronx, L.P.*, 11 F. Supp. 3d at 754 (S.D. Tex. 2014) (Harmon, J.); *Joe Hand Promotions, Inc. v. Roberson Management, Inc.*, 2006 U.S. Dist. LEXIS 56237, at *2-3 (S.D. Tex. Aug. 10, 2006) (Ellison, J.):

> Plaintiff now moves for summary judgment against Roberson.  In response, Roberson denies that it is the general partner of the partnership that owns Cabo or that it was in control over Cabo's televisions or employees on the day in question.  Plaintiff contends that Roberson is responsible for all activity on the premises or undertaken by Cabo employees, because Roberson is the holder of Cabo's liquor license.
>
> According to the Texas Alcoholic Beverage Code,
>
> [e]very permittee shall have and maintain exclusive occupancy and control of the entire licensed premises in every phase of the storage, distribution, possession, and

transportation and sale of all alcoholic beverages purchased, stored or sold on the licensed premises.  Any device, scheme or plan which surrenders control of the employees, premises or business of the permittee to persons other than the permittee shall be unlawful.

TEX. ALCO. BEV. CODE. ANN. § 109.53 (Vernon 2001).

The Texas Court of Appeals has held that "the sole means for exempting any portion of a premises from the 'licensed premises'" is provided by § 11.49(b)(1) of the Code. *Crosby v. State*, 696 S.W.2d 388, 390 (Tex. App. -- Dallas 1985, pet. granted), *rev'd and remanded on other grounds*, 750 S.W.2d 768 (Tex. Crim. App. 1987) (*en banc*). Section 11.49(b)(1), in turn, provides that, "*[s]ubject to the approval of the commission or the administrator . . .*, an applicant for a permit or license may designate a portion of the grounds, buildings, vehicles, and appurtenances to be excluded from the licensed premises." TEX. ALCO. BEV. CODE. ANN. § 11.49(b)(1) (Vernon 1979) (emphasis added).

*If such a designation has been made and approved* as to the holder of a license or permit authorizing the sale of alcoholic beverages at retail or as to a private club registration permit, the sharing of space, employees, business facilities, and services with another business entity . . ., does not constitute a subterfuge or surrender of exclusive control in violation of Section 109.53 of this code . . . .

*Id.* § 11.49(b)(2) (emphasis added).

There is no evidence that Roberson designated any area of the Cabo as separate or received permission to do so from the licensing authority. ***Accordingly, the Court finds that Roberson was responsible for all portions of the Cabo, including the televisions, and for the actions of all of the Cabo's employees***. (emphasis added).

8.     Plaintiff contends that Defendant acted willfully pursuant to Section 605 or Section 553 of the Communications Act.  *See, e.g.*:

• *J&J Sports Prods. v. Bandera Cowboy Bar LLC,* 2016 U.S. Dist. LEXIS 58603, at * 10-11 (W.D. Tex. May 2, 2016) (Ezra, J.) ("Since Plaintiff was the exclusive licensor of the Event, a commercial establishment needed

Plaintiff's authorization to receive the broadcast. Therefore, in order for an unauthorized commercial establishment to receive the scrambled signal, there must be some type of wrongful action to intercept and unscramble the signal such as an unauthorized decoder or satellite access card. After all, scrambled satellite signals do not unscramble themselves. Curiously, despite arguing no evidence exists that they intercepted the decoded signal, Defendants submit evidence in the same breath that "a customer [used] his own equipment that was brought into the bar" that enabled the Establishment to broadcast the Event. The fact that a patron, and not Defendants, may have intercepted the signal is an irrelevant fact for purposes of avoiding liability because Section 605 is a strict liability statute");

- *Joe Hand Promotions, Inc. v. Malespin*, 2001 U.S. Dist. LEXIS 2037, at *9-10 (S.D.N.Y. Feb. 27, 2001) ("The respective defendants elected not to enter into contracts with plaintiff to obtain the transmission of the Program. Their only means of obtaining the Program, and to avoid paying the legal subscription rate for a commercial establishment, would be: (a) using an illegal descrambler in a satellite receiver; (b) using a pirate cable box; (c) registering their respective commercial establishments as residential sites rather than commercial; and (d) ordering the Program for their respective residences and moving their residential cable boxes to their commercial establishments. The Court finds that employing any one of these means to defraud plaintiff would be evidence of willfulness and would support an award of enhanced damages.");

- *KingVision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001) ("In order to access the telecast, it would have been necessary to use an unauthorized decoder, to illegally divert cable service into the store, or improperly relocate an authorized decoder... In any of these scenarios, the illegality of the action would have been apparent to the perpetrator. And there can be little doubt that the defendants were motivated by profit in showing the fight.");

- *KingVision Pay-Per-View, Ltd. v. Valles*, EP-CA-179-DB, 2001 U.S. Dist. LEXIS 24268, at *9 (W.D. Tex. March 30, 2001) ("While Defendants may not have been well-versed in the statutory restrictions on the unauthorized interception of satellite transmissions, the Court finds that there must have been some knowledge on the part of Defendants that such interception could not be had for free.");

- *Time Warner Cable v. Googies Luncheonette, Inc.*, 77 F. Supp. 2d 485, 490 (S.D.N.Y. 1999) (when finding willfulness, the court stated, "there can be no doubt that the violations were willful and

committed for purposes of commercial advantage and private gain. Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems".).

9.  Defendant, even if determined to be the prevailing party, cannot recover attorney's fees. *See e.g.*:

    • *DirecTV, Inc. v. Reyes*, 2006 U.S. Dist. LEXIS 31722, at *3-4 (N.D. Ill. May 4, 2006) ("DirecTV brings this case under the Cable Communications Policy Act (47 U.S.C. § 521 *et seq.*), and the Electronic Communications Privacy Act of 1986 (18 U.S.C. §§ 2510-22), which allow the prevailing *plaintiff* to recover attorneys' fees, but contain no similar provision for prevailing *defendants*. 47 U.S.C. § 605(d)(6), (e)(3)(B)(iii); 18 U.S.C. §§ 2520(a), (b)(3). Therefore, even if this case were to proceed to trial and a verdict were to be entered in favor of Reyes and against DirecTV, Reyes would still be required to pay all of his own attorneys' fees.").

10. Plaintiff elects statutory damages pursuant to 47 U.S.C. § 605 or § 553 of the Communications Act. The Communications Act provides an aggrieved party the option to elect statutory damages. This option is a considerable benefit to an aggrieved party, especially when actual damages are difficult to calculate. *See, e.g:*

    • *J&J Sports Prods. v. Crawford*, 2012 U.S. Dist. LEXIS 130003 at *11 (W.D. Tex. July 31, 2012) (Martinez, J.) ("According to the liberal language of 605(e)(3)(C)(i)(II), the amount of damages to be awarded is within the sole discretion of the trial court, so long as the award falls within the prescribed range.").

    • *Capitol Records, Inc. v. Thomas-Rasset*, 799 F. Supp. 2d 999, 1004-1005 (D. Minn. 2011); *KingVision-Pay-Per View, Ltd. v. Boom Town Saloon, Inc.*, 98 F. Supp. 2d 958, 966 (N.D. Ill 2000) (statutory damage scheme is intended to ensure that a plaintiff does not lack a damage remedy for a proven violation of the Cable Act in situations where damages may be difficult or impossible to quantify).

    • *Kingvision Pay-Per-View Corp. v. Ramirez*, 2006 U.S. Dist. LEXIS 59486 at *7-8 (S.D.N.Y. Aug. 11, 2006) (Court's may, but do not have to estimate an offender's profits when arriving at a damages award).

<u>DEFENDANT</u>:

1.  Defendant contends that he did not intercept, misappropriate, televise, divulge or exhibit the closed circuit telecast of the May 2, 2015 Floyd Mayweather, Jr. vs. Manny Pacquiao "Fight of the Century: at the Anchors Up establishment.

E.      STIPULATIONS AND UNCONTESTED FACTS

1.      Plaintiff is in the business of marketing and licensing commercial exhibitions of pay-per-view prizefight events.

2.      The Establishment was a commercial establishment on the date of the Event.

3.      The Establishment was a business open to the public on the date of the Event.

4.      Defendant was the owner of the Establishment on the date of the Event.

5.      Defendant had a right to control the Establishment on the date of the Event.

6.      Defendant had a right to control the activities of the Establishment on the date of the Event.

7.      Defendant had the right to supervise the activities of the Establishment on the date of the Event.

8.      Defendant had an obvious and direct financial interest in the activities of the Establishment on the date of the Event.

9.      Defendant did not pay a licensing fee for the Event for the Establishment.

10.     No one else acting on Defendant's behalf paid a licensing fee for the Event for the Establishment.

11.     Defendant did not order the Event for the Establishment from any other authorized party with the intention of paying Plaintiff for the telecast of the Event.

12.     No one else on Defendant's behalf ordered the Event for the Establishment from any other authorized party with the intention of paying Plaintiff for the telecast of the Event.

13.     Defendant did not receive authorization from Plaintiff to show the Event in the Establishment.

14.     Defendant did not receive permission from Plaintiff to show the Event in the Establishment.

15.     Defendant did not enter into an agreement with Plaintiff to show the Event in the Establishment.

16.     Defendant did not pay a licensing fee to Plaintiff in order to show the Event in the Establishment.

17.    Defendant's Establishment uses cable service to receive television programming.

18.    Defendant was the person named on the alcohol license or permit for the Establishment on the date of the Event.

19.    Defendant was the owner of the alcohol license or permit for the Establishment on the date of the Event.

20.    Defendant did not designate any portion of the Establishment to be excluded from the licensed premises that is subject to the alcohol license or permit.

21.    No portion or area of the Establishment is excluded from the alcohol license or permit that has been issued for the Establishment.

22.    The television monitors within the Establishment existed for the viewing pleasure of the Establishment's patrons on the date of the Event.

23.    On the date of the Event, there were multiple televisions within the Establishment.

24.    The Establishment exhibited television programming that is believed to be of interest to the Establishment's patrons.

25.    The commercial establishment seen on the photographs taken by Plaintiff's auditor(s) is the establishment Anchor Up Club, located at 576 Highport Road, Pottosboro, TX 75076.

26.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. §§ 553 and 605 and venue is proper pursuant to 28 U.S.C. § 1391(b).

27.    This Court has jurisdiction over this matter and the parties to this cause.

28.    This case is governed by the Communications Act of 1934, as amended, 47 U.S.C. §§ 553 and 605.

29.    47 U.S.C. §§ 553 and 605 of the Communications Act is a strict liability statute.

F.    CONTESTED ISSUES OF FACT AND LAW

1.    Whether Plaintiff possessed the proprietary rights to exhibit and sublicense the right to exhibit the Event.

2.    Whether through a licensing agreement with the promoter of the Event, Plaintiff was the exclusive licensor to exhibit the Event at closed circuit locations, such as theaters, arenas, clubs, lounges, restaurants and other commercial establishments throughout the State of Texas.

3.      Whether, in Texas, the Event was legally available to commercial establishments only through an agreement with Plaintiff.

4.      Whether the interstate satellite and/or cable transmission of the Event was not available to or intended for the use of the general public.

5.      Whether Defendant intercepted the broadcast of the Event.

6.      Whether the Event was broadcasted and viewed in Defendant's Establishment on the date of the Event.

7.      Whether the Establishment received the broadcast of the Event through a satellite television or cable television service.

8.      Whether Defendant was aware that patrons or clientele of the Establishment watched the Event on the premises on May 2, 2015.

9.      Whether the Events were received in the Establishment because Defendants employed some means to intercept or receive the Events other than paying Plaintiff for the right to receive and broadcast the Event.

10.     Whether Defendant, or anyone on behalf of Defendant, ordered the Event for the Establishment.

11.     Whether Defendant ordered the Event from any other authorized party.

12.     Whether Defendant paid a sublicensing fee for the Event of the Establishment.

13.     Whether Defendant was aware that a licensing fee had to be paid in order to telecast the Event in the Establishment.

14.     Whether Defendant was a manager of the Establishment on the date of the Event.

15.     Whether Defendant had the ability to control the activities of the Establishment on the date of the Event.

16.     Whether Defendant had the ability to supervise the activities of the Establishment on the date of the Event.

17.     Whether the persons at the Establishment serving as bartenders, waiters/waitresses, and/or the manager, acted as agents on Defendant's behalf on the date of the Event.

18.     Whether Defendant obtained a monetary benefit from the Establishment's profits on the date of the Event.

19.     Whether Defendant willfully exhibited or broadcast the Event at the Establishment.

20.     Whether Defendant intentionally exhibited or broadcast the Event at the Establishment.

21.     Whether Defendant assisted in the interception, broadcast, and showing of the Event in Defendant's Establishment.

22.     Whether Defendant obtained the telecast of the Event by illegal means.

23.     Whether Defendant intentionally secured the telecast and broadcasted the Event by deception.

24.     Whether Defendant broadcasted the Event at the Establishment with the intent and for the sole purpose of attracting business to the Establishment.

25.     Whether by broadcasting the Event, Defendant willfully injured Plaintiff.

26.     Whether Defendant intended to broadcast the Event while avoiding payment of the commercial licensing fee.

27.     Whether Defendant owes Plaintiff reasonable attorney's fees for the prosecution of this lawsuit, including reasonable amounts for the prosecution, post-trial, appeal, and collection.

28.     Whether the transmission of the Event originated via satellite and was electronically coded or "scrambled."

29.     Whether Defendant violated the Federal Communication Act of 1934 for the unauthorized interception and broadcast of the Events, under either 47 U.S.C. § 553 or § 605.

30.     Whether Plaintiff is an aggrieved party pursuant to 47 U.S.C. § 553 or § 605. *See* 47 U.S.C. § 605(d)(6) ("any person with proprietary rights in the intercepted communication…" may bring a private cause of action against one who acts in violation of Section 605).

31.     Whether Plaintiff is entitled to receive statutory damages and the amount of statutory damages to be awarded to Plaintiff against Defendant pursuant to 47 U.S.C. § 553 or § 605.

32.     Whether Plaintiff is entitled to receive additional (or enhanced) damages and the amount of additional damages to be awarded to Plaintiff against Defendant pursuant to 47 U.S.C. § 553 or § 605.

33.     Whether Plaintiff is entitled to recover its attorney's fees and the amount of attorneys' fees to be awarded to Plaintiff against Defendant pursuant to 47 U.S.C. § 553 or § 605.

34.     Whether Defendant, even if determined to be the prevailing party, cannot recover attorney's fees.  *See e.g.:  DirecTV, Inc. v. Reyes*, 2006 U.S. Dist. LEXIS 31722, at *3-4 (N.D. Ill. May 4, 2006) ("DirecTV brings this case under the Cable Communications Policy Act (47 U.S.C. § 521 *et seq.*), and the Electronic Communications Privacy Act of 1986 (18 U.S.C. §§ 2510-22), which allow the prevailing *plaintiff* to recover attorneys' fees, but contain no similar provision for prevailing *defendants*.  47 U.S.C. § 605(d)(6), (e)(3)(B)(iii); 18 U.S.C. §§ 2520(a), (b)(3).  Therefore, even if this case were to proceed to trial and a verdict were to be entered in favor of Reyes and against DirecTV, Reyes would still be required to pay all of his own attorneys' fees.").

G.     LIST OF WITNESSES

PLAINTIFF:

| No. | WITNESS NAMES AND ADDRESSES | WILL BE CALLED TO TESTIFY / MAY BE CALLED TO TESTIFY | NATURE OF TESTIMONY | ESTIMATED DURATION |
|---|---|---|---|---|
| 1. | James E. Kirkpatrick c/o Michael C. Wynne WYNNE & SMITH 707 West Washington St. P.O. Box 2228 Sherman, TX 75090 | Will be called to testify | Defendant James E. Kirkpatrick is and was the owner of the commercial establishment named Anchor's Up Bar also known as Anchor Up Island Shuttle on the night of the May 2, 2015 Floyd Mayweather, Jr. vs. Manny Pacquiao "The Fight of the Century" Championship Fight Program. Defendant may have knowledge of all matters relating to this lawsuit, including how the Event was telecast in the commercial establishment, the number of persons in the establishment viewing the unauthorized transmission of the telecast, profits made by Defendant, goods sold by | Live 1.5 hours |

| | | | Defendant, cover charge charged by Defendant to enter the Establishment, if any, the advertisement of the Event at the Establishment, and the means and methods of pirating the telecast of the Event. | |
|---|---|---|---|---|
| 2. | Aaron Bucy c/o LAW OFFICES OF THOMAS P. RILEY, P.C. 1114 Freemont Avenue South Pasadena, CA 91030 | Will be called to testify | Mr. Bucy has knowledge that Defendant broadcasted the Event in the Establishment, the number of televisions exhibiting the Event, and the number of patrons viewing the Event. | Live 2 hours |
| 3. | Lisett Bucy c/o LAW OFFICES OF THOMAS P. RILEY, P.C. 1114 Freemont Avenue South Pasadena, CA 91030 | May be called to testify | Mrs. Bucy is Aaron Bucy's wife. Mrs. Bucy accompanied Aaron Bucy on the night of May 2, 2015 to Defendant's Establishment (as well as other commercial establishments that day) so that Aaron would not enter the establishments alone and to serve as a Spanish speaking translator, if needed. Mrs. Bucy has knowledge that Defendant broadcasted the Event in the Establishment, the number of televisions exhibiting the Event, and the number of patrons viewing the Event. | Live 1 hours |

| 4. | Thomas P. Riley<br>LAW OFFICES OF THOMAS P. RILEY, P.C.<br>Attorney-In-Fact for J&J Sports Productions, Inc.,<br>1114 Freemont Avenue<br>South Pasadena, CA 91030 | Will be called to testify | Mr. Riley may testify regarding the license agreement for the Event, the rate card for the Event, the means and methods necessary to lawfully obtain the signal to exhibit the Event, and the damages suffered by Plaintiff. Mr. Riley may testify regarding the Auditor's Affidavit and applicable License Agreement and Rate Card for the Event. Mr. Riley is the Attorney-In-Fact for J&J Sports Productions, Inc. and custodian of records for J&J Sports Productions, Inc. | Live<br>2 hours |
| 5. | David M. Diaz<br>LAW OFFICES OF DAVID DIAZ, PLLC<br>825 Watters Creek Blvd.<br>Building M, Suite 250<br>Allen, Texas 75013<br>(972) 996-4855 | May be called to testify | Mr. Diaz may testify regarding reasonable and necessary attorney's fees for the prosecution of Plaintiff's claims and the basis for same. | If called,<br>30 min. |
| 6. | Plaintiff reserves the right to call any witnesses listed by Defendant. | Call if need arises | | |

DEFENDANT:

| NO. | WITNESS NAMES AND ADDRESSES | WILL BE CALLED TO TESTIFY / MAY BE CALLED TO TESTIFY | NATURE OF TESTIMONY | ESTIMATED DURATION |
|---|---|---|---|---|
| 1. | James E. Kirkpatrick<br>c/o Michael C. Wynne<br>WYNNE & SMITH<br>707 West Washington St.<br>P.O. Box 2228<br>Sherman, TX 75090 | Will be called to testify | The Anchors Up Establishment did not broadcast the Event in question | Live 1 hour |

| | | | | |
|---|---|---|---|---|
| 2. | Heather Prince Fetty<br>409 N. A. Street<br>Calera, Okalahom | Will be called to testify | The Anchors Up Establishment did not broadcast the Event in question | Live 30 mins |
| 3. | Kristen Zemlicka<br>139 Beach Drive<br>Pottsboro, TX 75076 | Will be called to testify | The Anchors Up Establishment did not broadcast the Event in question | Live 30 mins |
| 4. | Nelda and Chuck Davis<br>TV Cable of Grayson County<br>2001 Nichole Blvd<br>Pottsboro, TX 75076 | Will be called to testify | TV Cable of Grayson County's availability of pay-for-view programming and whether such was provided to James Kirkpatrick or Anchors Up | Live 30 mins |
| 5. | Michael C. Wynne<br>WYNNE & SMITH<br>707 West Washington St.<br>P.O. Box 2228<br>Sherman, TX 75090 | Will be called to testify | Reasonable and necessary attorney's fees | Live 30 mins |
| 6. | Defendant reserves the right to call any witnesses listed by Plaintiff. | Call if need arises | | |

H.    LIST OF EXHIBITS

PLAINTIFF:

| Ex. No. | DESCRIPTION OF EXHIBIT | OFFR. | OBJ. | ADMIT. | N/ADM |
|---|---|---|---|---|---|
| P-1 | *Closed Circuit Television License Agreement* between Plaintiff and the promoter of the May 2, 2015 Floyd Mayweather, Jr. vs. Manny Pacquiao "The Fight of the Century" Championship Fight Program (the "Event"). (documents bates labeled "J&J – 001" through "J&J - 007") | | | | |
| P-2 | The Rate Card for the Event (documents bates labeled "J&J - 008") | | | | |

| P-3 | *Affidavit* of Aaron Bucy, for Anchor's Up Bar, Plaintiff's auditor and, an eye-witness who entered Defendant's commercial establishment on the night of the Event and observed the Event being exhibited to the patrons of the Establishment. (documents bates labeled "J&J – 009" through "J&J - 010") | | | | |
| --- | --- | --- | --- | --- | --- |
| P-4 | Photographs taken by Aaron Bucy (3 photographs) (document bates labeled "J&J – 011" through "J&J - 013") | | | | |
| P-5 | Video taken by Aaron Bucy | | | | |
| P-6 | Correspondence from Plaintiff's representative and custodian of record, Thomas Riley, to Defendant (documents bates labeled "J&J – 015" through "J&J – 021") | | | | |
| P-7 | *Fed. R. Evid. 902(11) Affidavit of Thomas Riley*, Plaintiff's representative and custodian of record, who has knowledge of the piracy file involving Defendant, Plaintiff's licensing agreement, various means and methods of pirating closed-circuit pay-per-view telecasts, such as the Event, and Plaintiff's damages. (documents bates labeled "J&J – 022" through "J&J - 044") | | | | |
| P-8 | Defendant's Responses to Plaintiff's Request for Admission – *Defendant Answers to Plaintiff's First Requests for Admission* | | | | |
| P-9 | Defendant's Responses to Plaintiff's First Set of Interrogatories – *Defendant's Answers to Plaintiff's First Set of Interrogatories* | | | | |
| P-10 | Texas Alcoholic Beverage Commission identifying license/permit information for Defendant's commercial establishment | | | | |
| P-11 | *Assumed Name Records – Certificate of Ownership* for Anchor Up Club (documents bates labeled "J&J – 024" through "J&J – 025") | | | | |
| P-12 | *Assumed Name Records – Certificate of Ownership* for Anchor Up Island Shuttle (documents bates labeled "J&J – 026" through "J&J – 028") | | | | |

| P-13 | *Affidavit* of Aaron Bucy for La Ranchera Restaurant, dated May 11, 2015 (with photographs)<br>(documents bates labeled "J&J – 091" through "J&J – 094") | | | | |
| P-14 | *Affidavit* of Aaron Bucy for Sherman Elk's Lodge #2280, dated May 11, 2015 (with photographs)<br>(documents bates labeled "J&J – 081" through "J&J – 088") | | | | |
| P-15 | *Affidavit* of Aaron Bucy for Rivera's Restaurant and Bakery, dated May 11, 2015 (with photographs)<br>(documents bates labeled "J&J – 071" through "J&J – 078") | | | | |
| P-16 | *Affidavit* of Aaron Bucy for Taqueria Hidalgo Super Panaderia, dated May 11, 2015 (with photographs)<br>(documents bates labeled "J&J – 064" through "J&J – 068") | | | | |
| P-17 | Invoice No. 050215-3555 for Aaron Bucy of Bulldawg Investigations<br>(document bates labeled "J&J – 059") | | | | |
| P-18 | Check No. 8107 payable to Bulldawg Investigations<br>(document bates labeled "J&J – 060") | | | | |
| P-19 | Email from Jackie Cortez to Aaron Bucy, dated April 30, 2015, 11:23 a.m. (with four (4) attachments)<br>(documents bates labeled "J&J – 107" through "J&J – 115") | | | | |
| P-20 | Email from Aaron Bucy to Jackie Cortez, dated April 30, 2015, 12:08 p.m. (with one (1) attachment)<br>(documents bates labeled "J&J – 116" through "J&J – 118") | | | | |
| P-21 | Email from Jackie Cortez to Aaron Bucy, dated May 1, 2015, 8:33 p.m.<br>(documents bates labeled "J&J – 119" through "J&J – 123") | | | | |
| P-22 | Email from Jackie Cortez to Aaron Bucy, dated May 2, 2015, 7:18 p.m.<br>(documents bates labeled "J&J – 124" through "J&J – 128") | | | | |
| P-23 | Email from Aaron Bucy to Jackie Corez, dated May 5, 2015, 9:29 a.m.<br>(documents bates labeled "J&J – 129" through "J&J – 130") | | | | |
| P-24 | Email from Aaron Bucy to Jackie Cortez, dated May 12, 2015, 2:13 p.m.<br>(document bates labeled "J&J – 131") | | | | |

| Ex. No. | Description of Exhibit | | | | |
|---|---|---|---|---|---|
| P-25 | J&J Sports Productions, Inc. Expense Report for May 2, 2015 Mayweather v. Pacquiao event (documents bates labeled "J&J – 135" through "J&J – 136") | | | | |
| P-26 | Resume of David M. Diaz, attorney for Plaintiff (document bates labeled "J&J – 060") | | | | |
| P-27 | Attorney fee supporting documents, including: (1) *Texas Lawyer* 2015 Hourly Billing Rates Chart; (2) State Bar of Texas, Dept. of Research and Analysis: *2009 Hourly Rate Fact Sheet*; and (3) *Texas Lawyer 2014 Salary and Billing Report* (published in Texas Lawyer July, 2014 edition) (documents bates labeled "J&J – 046" through "J&J – 075") | | | | |

Defendant:

| Ex. No. | Description of Exhibit | Offr. | Obj. | Admit. | N/Adm |
|---|---|---|---|---|---|
| D-1 | Affidavit and Instruction Sheet and Form of Affidavit | | | | |
| D-2 | Bucy Invoice | | | | |
| D-3 | Check payable to Aaron Bucy | | | | |
| D-4 | Membership Time Stamp | | | | |
| D-5 | Redacted Bucy Affidavit attached to Plaintiff's Motion for Default Judgment (Docket 14-4) only if the unredacted Affidavit is admitted. | | | | |
| D-6 | Photo of billboard marquee located outside of Anchor Up in parking lot | | | | |
| D-7 | CV of Michael C. Wynne, Attorney for Defendant | | | | |
| D-8 | Attorney fee supporting documents | | | | |

I.    LIST OF ANY PENDING MOTIONS

There are no motions currently pending before the court at this time.

J.     PROBABLE LENGTH OF TRIAL

The parties estimate that the probable length of the trial will be 1 day (between 4-6 hours). One of Plaintiff's witnesses will be traveling from California to Texas for the trial.

K.     MANAGEMENT CONFERENCE LIMITATIONS

None.

L.     CERTIFICATIONS

The undersigned counsel for each of the parties in this action do hereby certify and acknowledge the following:

(1)     Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

(2)     Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with;

(3)     Each exhibit in the List of Exhibits herein:

(a)     is in existence;

(b)     is numbered; and

(c)     has been disclosed and shown to opposing counsel.

Approved as to form and substance:


Attorney for Plaintiff:   _/s/   David M. Diaz_____

Attorney for Defendant:   _/s/   Michael C. Wynne_____


This Joint Pre-Trial Order is hereby approved this _____ day of June, 2020.




_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE