# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| J&J SPORTS PRODUCTIONS, INC. | § | |
| | § | |
| v. | § | Civil Action No.  4:18-cv-310 |
| | § | Judge Mazzant |
| JAMES E. KIRKPATRICK, individually, | § | |
| and d/b/a ANCHOR UP, and d/b/a | § | |
| ANCHOR UP CLUB, and d/b/a | § | |
| ANCHOR'S UP BAR, and d/b/a ANCHOR | § | |
| UP ISLAND SHUTTLE | § | |

## MEMORANDUM OPINION AND ORDER AND
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On April 27, 2018, Plaintiff J&J Sports Productions, Inc. filed its original complaint against Defendant James E. Kirkpatrick, individually and d/b/a Anchor Up, Anchor Up Club, Anchor's Up Bar, and Anchor Up Island Shuttle ("Defendant") (Dkt. #1).  Plaintiff asserted that Defendant violated the Communications Act of 1934 (the "Communications Act")—47 U.S.C. §§ 553 and 605—by exhibiting a closed-circuit telecast of a boxing match at Anchor Up Club (the "Establishment") without authorization to do so (Dkt. #36).

On February 20, 2019, Plaintiff filed its motion for default judgment against Defendant (Dkt. #14).  The Clerk entered a default against Defendant on February 22, 2019 (Dkt. #17).  Then, on March 14, 2019, Defendant filed his unopposed motion to set aside the default (Dkt. #19), which was granted by the Court the following day (Dkt. #21).

On June 12, 2020, the Court held a bench trial in the above-styled matter.  After consideration of the parties' arguments and of the evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  To the extent that any of the findings of fact constitute conclusions of law, or any of the conclusions of law constitute findings of fact, they are adopted as such.

## FINDINGS OF FACT

Having carefully reviewed the evidence and arguments presented at trial, the Court finds the following facts by a preponderance of the evidence.

### I.    Background

#### A.    Parties

1.    Plaintiff is a corporation that is organized under the laws of the State of California and has its principal place of business in California.  Plaintiff is in the business of marketing and licensing commercial exhibitions of closed-circuit pay-per-view events.

2.    Defendant is an individual residing in Texas.  Defendant owns and operates the Establishment—a bar located in Pottsboro, Texas.  Defendant's principal place of business is therefore in Texas.

#### B.    Issues

3.    The two main issues before the Court are: (1) whether Plaintiff's license includes rights to sublicense any pre-fight commentary; and (2) whether Defendant displayed Plaintiff's licensed broadcast at the Establishment without authorization.

### II.    Contract Interpretation

4.    Plaintiff entered into a contract (the "License") with Mayweather Promotions, LLC to acquire the proprietary rights to exhibit and sublicense the rights to exhibit the closed-circuit telecast of the May 2, 2015 Floyd Mayweather, Jr. v. Manny Pacquiao "The Fight of the Century" Championship Fight (the "Bout") and accompanying undercard matches.  Specifically, the License stated that Plaintiff could sublicense the "Event"—defined as Mayweather Promotions, LLC's "live telecast of the captioned Bout and accompanying undercard matches."

5.     The License provided Plaintiff with the exclusive right to exhibit and sublicense the right to exhibit the Event to commercial establishments throughout the United States and, in particular, the state of Texas.  Plaintiff therefore had the exclusive right to exhibit and sublicense the right to exhibit the Event to the Establishment.

### A.     Thomas Riley

6.     Thomas Riley ("Riley") is an attorney in Pasadena, California.  He is an attorney for Plaintiff, serving as Plaintiff's primary piracy counsel, testifying at trials, and litigating its piracy claims.  Riley also oversees the investigation of potential pirates when major pay-per-view events are broadcast.

7.     Riley testified regarding the closed-circuit agreements, such as the License, that Plaintiff enters into with various promotors.  He stated that these closed-circuit agreements were boilerplate agreements that had been the same for years.  Under these agreements, the promotor is required to put on certain live events, while Plaintiff is required to sell the event's broadcast and enforce the rights to view it.

8.     Riley testified that the Mayweather–Pacquiao fight program included different segments.  According to Riley, the Event started at 8:00 p.m.  Before the Event started, there was an hour countdown program.  This countdown was available for everyone as the signal was unencrypted.  Viewers were therefore not required to purchase the Event in order to see the countdown.  When the Event began at 8:00 p.m., however, the signal was encrypted, and the pay wall went up.  At that time, no viewers could see the Event without purchasing the program from a cable or satellite provider.  If the viewer purchased the Event, the signal would become unencrypted and the viewer could then see the program.

9.    Riley testified that the pattern and the custom of the parties defines the Event as including everything in the pay-per-view window—from 8:00 p.m. until the program's end. Accordingly, he testified that the Event not only included the Bout and accompanying undercard matches, but that it also included anything else played during the telecast, such as locker room interviews, older clips of the boxers, and post-fight interviews.  He further stated that Plaintiff paid for the licensing rights to the entire telecast package—not just the fights.

10.    The Court finds Riley's testimony to be credible.

## III.    Violation of the Communications Act

11.    In Texas, the Broadcast[1] was legally available to businesses only though an agreement with Plaintiff.  Under such agreements, businesses were required to pay a sublicense fee to Plaintiff in order to receive the Broadcast.  The sublicense fee was based on each business's occupancy.

12.    On May 2, 2015, the Broadcast was televised.

13.    On May 2, 2015, Defendant owned and operated the Establishment.  Defendant had the right and ability to supervise the activities of the Establishment, and he had a financial interest in the Establishment's activities on May 2, 2015.  Furthermore, the Establishment was a business that was open to the public on the day of the Broadcast.[2]

14.    On May 2, 2015, Defendant did not have an agreement with Plaintiff for the sublicense of the Broadcast.  Defendant did not order the Broadcast for the Establishment or pay

---

[1] There is a question of law regarding whether, under the License, the Event includes pre-fight commentary.  To resolve any confusion, the Court uses the term "Broadcast" to include the Bout, accompanying undercard matches, and pre-fight commentary that was played after 8:00 p.m.

[2] While the Establishment was open to the public, customers needed to have a private membership to the Establishment in order to be served alcohol.

the Broadcast's licensing fee to Plaintiff.[3]  As a result, Defendant did not have authorization from Plaintiff to show the Broadcast at the Establishment.

15.     On May 2, 2015, there were three televisions in the Establishment.  Those television monitors existed for the viewing pleasure of the Establishment's patrons on the date of the Broadcast.

16.     On May 2, 2015, there were two employees working at the Establishment: Heather Douglas ("Douglas") and Kristen Zemlicka ("Zemlicka").

**A.     Heather Douglas**

17.     Between October 2014 and June 2016, Douglas was a waitress at the Establishment.

18.     Douglas testified that the Establishment's televisions used cable.  The television at issue was mounted on the wall behind the bar.  It had wiring that went inside the walls.  Douglas testified that she did not remember a pay-per-view program being played at the Establishment.

19.     Douglas was working as a waitress at the Establishment on May 2, 2015.  She testified that no fights were shown at the Establishment on May 2, 2015.  She also stated that Defendant did not instruct her to try to put on the Broadcast.

20.     The Court finds Douglas's testimony to be credible.

**B.     Kristen Zemlicka**

21.     During 2015, Zemlicka was a bartender at the Establishment.

22.     Zemlicka testified that Defendant never showed pay-per-view events at the Establishment.  She testified that the Establishment's customers were interested in watching pay-per-view events; those customers, however, were always told they had to go elsewhere to see pay-per-view events since they would not be played at the Establishment.

---

[3] Defendant did testify that he purchased the Broadcast for his personal use through his satellite provider.  He watched the fight in his trailer in Wichita Falls, Texas—not at the Establishment.

23.     Zemlicka was working as a bartender at the Establishment on May 2, 2015.  Like Douglas, she testified that the Mayweather–Pacquiao fight was not shown at the Establishment on May 2, 2015.  Zemlicka also stated that Defendant did not tell her that he was going to show the Mayweather–Pacquiao fight at the Establishment and that he did not otherwise instruct her to do so.

24.     The Court finds Zemlicka's testimony to be credible.

25.     On May 2, 2015, in addition to Douglas and Zemlicka, Aaron Bucy ("Bucy") was also at the Establishment on the night of the Broadcast.

**C.      Aaron Bucy**

26.     On May 2, 2015, Bucy was a private investigator with Bulldawg Investigations in Sherman, Texas.  He was hired by the Law Offices of Thomas P. Riley, P.C. (the "Riley Office") to investigate whether commercial properties were exhibiting the Broadcast without authorization from Plaintiff.

27.     Bucy was asked to go to a number of commercial properties on the night of May 2, 2015.  If Bucy found that any of those properties was showing the Broadcast, Bucy was required to complete various tasks in order to earn compensation for his time.  For example, Bucy was asked to complete an affidavit, which described the condition of each establishment, including, among other things, which televisions he believed were showing the Broadcast.  Bucy was also asked to take photo or video evidence of the locations he was scouting, when possible.  Once Bucy turned in his affidavit and any additional evidence, the Riley Office would determine whether the materials were up to its standards and would then compensate Bucy.  The Riley Office would give him a base price for the affidavit and additional compensation for any other evidence he collected.

28.     On May 2, 2015, the Riley Office sent Bucy a list of commercial properties to visit to determine whether the Broadcast was being played.  That list—referred to as the "Legal List"— included only names of businesses that did not have the rights to exhibit the Broadcast at a commercial property.  Bucy testified that the Establishment was on the Legal List.  For that reason, Bucy decided to go to the Establishment to determine whether the Establishment was playing the Broadcast.

29.     On May 2, 2015, Bucy went to the Establishment.  The Establishment was the first place Bucy went to investigate for the evening, and it was the first time he had ever investigated for the Riley Office.  After completing his investigation, Bucy sent the Riley Office an affidavit and video evidence of what he claims he saw while at the Establishment.

30.     According to Bucy's affidavit, the seating capacity of the Establishment is fifty; however, there were only three customers when Bucy was there.  Defendant did not require a cover charge for entrance at the Establishment on May 2, 2015, and he did not display any advertisements that he would be showing the Bout there.

31.     While at the Establishment, Bucy took a short video of one of Defendant's three televisions.  The video showed the television behind the bar.  It is undisputed that the other two televisions did not show the Broadcast.

32.     The video showed that there was wire coming from the television behind the bar, going through the kitchen window.  On the television screen, there were three commentators talking about the upcoming fight: Paul Malignaggi, James Brown, and Lennox Lewis.  While Bucy was at the Establishment, there were no fights—neither the Bout nor any accompanying undercard matches—played on the television.

33.     Bucy testified that on May 2, 2015, he arrived at the Establishment at 7:55 p.m. While there, Bucy ordered a drink.  Defendant requires its customers to have a private membership at the Establishment before serving them alcohol, so Bucy gave the Establishment's waitress his driver's license—which the waitress scanned—and then signed a receipt agreeing to a membership.  He also stated that he left the establishment at 8:15 p.m.[4]  Bucy further testified that the video of the television was taken after 8:00 p.m., so the video showed the Broadcast being exhibited at the Establishment.

34.     The Court finds Bucy's testimony to be credible.

35.     In sum, based on Douglas's, Zemlicka's, and Bucy's testimony, the Court finds that there was no evidence that the Mayweather–Pacquiao fight nor any accompanying undercard matches were played at the Establishment.  Nevertheless, the Court concludes that the pre-fight commentary, which was aired after 8:00 p.m., was played at the Establishment.

36.     There is also a fact issue as to whether the pre-fight commentary was played via satellite or cable.  The testimony of Nelda Davis ("Davis")—the owner of the cable company that serviced the Establishment—and Defendant—the Establishment's owner—informs the Court's determination.

**D.     Nelda Davis**

37.     Davis owned and operated TV Cable of Grayson County ("TV Cable").  TV Cable is located in Grayson County, Texas.  It provides cable television and internet services; it does not provide satellite television.  Davis owned the company from 1989 until October 2016.  She was

---

[4] There was some conflicting evidence as to what time Bucy arrived and left the Establishment.  This is due to the timestamp shown on the receipt Bucy signed in order to get a membership at the Establishment.  The timestamp showed that his driver's license was scanned at 7:00 p.m.  Because Defendant credibly testified that he had not changed the machine since Daylight Savings Time caused the clocks to spring forward, the Court finds that Bucy's testimony that he was at the Establishment from 7:55 to 8:15 p.m. to be more credible than the timestamp.

also an employee of TV Cable, serving as the executive manager.  In that role, Davis managed the office and the billing.

38.     Davis testified that the Establishment was a cable customer of TV Cable at the time the Broadcast was televised and that its televisions were serviced by TV Cable.

39.     Davis testified that TV Cable's cable service ran to the Establishment's televisions through a coaxial cable.  The Establishment's televisions did not use cable boxes.

40.     Davis testified that TV Cable could not provide pay-per-view programs to the Establishment because TV Cable did not have the equipment necessary to provide that service.  In order to receive pay-per-view, the viewer must have a box.  TV Cable did not provide the Establishment with a pay-per-view box.  As a result, Davis asserted, the Establishment could not have received the Broadcast from TV Cable.

41.     The Court finds Davis's testimony to be credible.[5]

**E.     James Kirkpatrick**

42.     Defendant testified that the Establishment uses cable service; Defendant does not have a satellite dish or an account with a satellite television provider at the Establishment.  Through the cable provider, the Establishment received its television signal via a coaxial cable that went into the wall.  The Court finds that this testimony is credible.

43.     After considering the witnesses' testimony, the Court finds that there is no evidence that Defendant had a satellite or used a satellite provider at the Establishment.  There is evidence, however, that the Establishment had a cable system and that there was a cable connected to the television airing the Broadcast.  While the Court cannot determine the exact means by which the

---

[5] While this part of Davis's testimony is credible, the Court also notes that her testimony does not establish that Defendant was unable to display the Broadcast through his cable service or wire.  Davis, herself, admitted that she did not know how people could use the cable in order to pirate a signal.

pirating was accomplished, the evidence before the Court can only confirm that the Broadcast was shown through a cable system, using a cable wire.  Consequently, the Court finds that on May 2, 2015, the Broadcast's pre-fight commentary was shown at the Establishment via a cable system, using a cable wire on the back of the television.

## CONCLUSIONS OF LAW

### I.     Jurisdiction & Venue

1.      The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because this action arises under the Communications Act—a federal law.  *E.g.*, *J&J Sports Prods., Inc. v. Los Gemelos Inc.*, No. SA-14-CA-414-FB, 2015 WL 12552033, at *1 (W.D. Tex. Apr. 9, 2015) (holding that the court had federal question jurisdiction on claims brought under the Communications Act).

2.      The Court also has personal jurisdiction over Defendant.  Defendant is a Texas resident and has his principal place of business in Texas.

3.      Venue for this action is proper in this Court under 28 U.S.C. § 1391(b)(2).

### II.    Contract Interpretation

4.      Plaintiff asserts that Defendant violated the Communications Act—47 U.S.C. §§ 553 and 605.  In order to succeed on a claim under the Communications Act, Plaintiff must prove that it can enforce its sublicense against Defendant.  *See J & J Sports Prods., Inc. v. Morales*, 226 F. Supp. 3d 730, 733–34 (W.D. Tex. 2016) (denying the plaintiff's motion for summary judgment, which sought relief under the Communications Act, because the plaintiff did not prove that it had rights under its license that it could enforce against the defendant).  As Plaintiff "cannot

enforce a license it does not control," the Court must first address the breadth of Plaintiff's License.[6] *Id.* at 733.

5.      The parties disagree on what rights Plaintiff has under the License.  In order to decide this issue, the Court first determines which state's law applies.

### A.      Choice of Law

6.      A federal court must follow the choice-of-law rules of the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  The Court must look to the forum state—Texas—for the law that governs its choice-of-law analysis.  *See id.*  Therefore, the Texas choice-of-law rules for contract claims apply.  *See Barnes v. Forest Hills Inv., Inc.*, 11 F. Supp. 2d 699, 703 (E.D. Tex. 1998).

7.      Texas courts use the "most significant relationship" test when resolving choice-of-law questions in contract cases.  *Id.* (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 760, 677–79 (Tex. 1990)).  In those cases, courts will apply the Restatement (Second) of Conflict of Laws § 188.  *See id.*  It provides that the choice of law for a contract cause of action is evaluated in the following way:

> In the absence of an effective choice of law by the parties . . . , the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.

---

[6] Plaintiff asserts that Defendant cannot challenge Plaintiff's rights under the License because Defendant is not a third-party beneficiary to the License (Dkt. #56 at pp. 3–4).  Defendant, here, is not a third-party beneficiary asserting that Plaintiff is breaching the License.  Rather, Defendant disputes whether Plaintiff has the rights it claims to be enforcing.  Such a determination is not only permissible but also necessary in this instance.  *See Morales*, 226 F. Supp. 3d at 733–34 (determining what rights the plaintiff had and could enforce against the defendant, who was not a party to the contract); *Pers. Preference Video, Inc. v. Home Box Off., Inc.*, 986 F.2d 110, 112–14 (5th Cir. 1993) (interpreting language in the defendant's contract with a third party that was challenged by the plaintiff, a non-party to the contract).

*Id.* at 703–04 (citing Restatement (Second) of Conflict of Laws § 188(2) (1971)).  "Furthermore, the Restatement instructs that the second and third contacts—the place of negotiation and performance—are the most significant.  If both of those contacts occur in the same state, that state's law will usually apply."  *Corder v. BBG Commc'ns, Inc.*, No. W-11-CA-00264, 2012 WL 3843714, at *5 (W.D. Tex. July 30, 2012) (citing Restatement (Second) of Conflict of Laws § 188(3)).

8.     Applying these factors to the facts of this case, the Court finds that Nevada law applies.  It is undisputed[7] that the place of contracting, the place of performance, and the location of the subject matter is Nevada.  Defendant also does not dispute that the places of negotiation were Nevada and California.  Lastly, with respect to the final factor, the Court notes that Plaintiff's place of business is in California and Defendant has a domicile and place of business in Texas.

9.     Considering each factor, the Court finds that Nevada has the most significant relationship to the contractual issues in this claim.  To start, the places of negotiation and performance—the most significant factors—were in Nevada.  As those contacts occurred in Nevada, Nevada law should usually apply.  *See id.*

10.     Furthermore, the Court notes that the sole contact with Texas is relatively unimportant.  "The significan[ce] of the parties' domicile, place of incorporation, and principal place of business 'depends largely on the issue involved and upon the extent to which they are grouped with other contacts.'"  *Id.* (citing Restatement (Second) of Conflict of Laws § 188 cmt. e).  Here, the issue involves interpreting a license for professional boxing match telecasts, so Nevada—where these events are held—has the greatest interest.  Additionally, "because [this

---

[7] Defendant applied a different factor test in arguing that Texas law applies (Dkt. #57 at p. 4).  However, Defendant did not dispute the facts asserted by Plaintiff regarding the five-factor test applied here.  *See* (Dkt. #57).

place-of-business] contact is the only one that points to Texas, it obviously cannot be grouped with any others." *Id*. Therefore, Nevada has the most significant relationship here, and Nevada law applies.

**B.    The Contract**

11.    The parties disagree on whether the License covers pre-fight commentary.  The License gives Plaintiff the "exclusive license to exhibit . . . [Mayweather Promotions, LLC's] live telecast of the captioned Bout and accompanying undercard matches (the '**Event**') . . . ."  Plaintiff asserts that the Event includes the pre-fight commentary at the start of the program.  Defendant, however, argues that such a reading goes against the rules of contract interpretation.

12.    Under Nevada law, the Court must first determine whether the contract is ambiguous.  A "contract is ambiguous if it is reasonably susceptible to more than one interpretation."  *In re Premier Interval Resorts, Inc.*, 82 F. App'x 126, 128 (5th Cir. 2003) (citing *Margrave v. Dermody Props., Inc.*, 878 P.2d 291, 293 (Nev. 1994)).

13.    When the terms of a contract are unambiguous, the "terms are to be given their ordinary meaning, and . . . the intent of the parties must be ascertained from the contract itself." *Almy v. Adams*, No. 3:16-CV-231-MMD-WGC, 2019 WL 8377698, at *8 (D. Nev. Dec. 5, 2019) (citations omitted), *report and recommendation adopted sub nom. Almy v. Baze*, No. 3:16-CV-231-MMD-WGC, 2020 WL 819393 (D. Nev. Feb. 19, 2020).  Thus, if the Court finds that the contract is unambiguous, it "must not go beyond the agreement to construe it."  *Id*. (citing *In re Amerco Derivative Litig.*, 252 P.3d 681, 693 (Nev. 2011)).

14.    If, however, the Court finds that the contract is ambiguous, "[t]he best approach for interpreting [that] contract is to delve beyond its express terms and examine the circumstances surrounding the parties' agreement in order to determine the true mutual intentions of the parties."

13

*Mae v. Creagan*, 129 F. Supp. 3d 994, 998 (D. Nev. 2013) (citing *Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003)).

15.     The Court finds that the License is reasonably susceptible to two interpretations. The License provides that Plaintiff has the right to sublicense the "live telecast of the captioned Bout and accompanying undercard matches."  There is no doubt that this term is poorly drafted.[8]  Indeed, on its face, the Court finds that this term could be reasonably interpreted two ways.  First, the phrase "live telecast of the captioned Bout and accompanying undercard matches" could reasonably cover the entire telecast.  That would include not only the Bout and undercard matches but also the filler content aired before and after the fights—from when telecast starts at 8:00 p.m. until it ends.  Second, because the License only lists "the Bout and the undercard matches," Plaintiff's License could be limited to just that—the Bout and undercard matches but no other content, such as commentary.  The Court therefore finds that the License is reasonably susceptible to two interpretations and is ambiguous.

16.     Because the License is ambiguous, the Court looks to the circumstances surrounding Plaintiff and Mayweather Promotions, LLC's agreement in order to determine the true mutual intentions of the parties.  *Id.*  Here, only Plaintiff offered evidence of the circumstances surrounding the License and the parties' intentions.  Riley's testimony revealed that it was the pattern and custom of the parties to consider the Event as including everything in the pay-per-view window—from 8:00 p.m. until the program's end.  He also stated that the Plaintiff paid for the rights to the entire telecast package, not just the rights to exhibit the fights.  Based on Riley's

---

[8] Plaintiff would be well-advised to more clearly define its rights under future license agreements.

testimony, the Court finds that under the circumstances of the License and the packaged nature of

the program, the true intent of the parties was to transfer the rights to the *entire* telecast.[9]

17.     Because Mayweather Promotions, LLC and Plaintiff intended for the License to

cover the entire broadcast, the License gave Plaintiff the right to sublicense the rights to exhibit

the Bout, accompanying undercard matches, and any pre-fight or post-fight commentary that aired

after 8:00 p.m. until the program's end.  Because Plaintiff had the right to the pre-fight commentary

under the License, Plaintiff proved that it can enforce its sublicense against Defendant.  *See*

*Morales*, 226 F. Supp. 3d at 733–34.  As a result, the Court must determine whether Plaintiff has

established its claims under the Communications Act by a preponderance of the evidence.

## III.     Violation of the Communications Act

18.     This case is brought under §§ 553 and 605 of the Communications Act.  "Section

553 prohibits persons from 'intercept[ing] or receiv[ing] . . . any communications service offered

over a cable system' without authorization."  *J & J Sports Prods., Inc. v. Enola Invs., L.L.C.*, 795

F. App'x 313, 314 (5th Cir. 2020) (citing 47 U.S.C. § 553(a)(1)).  "Section 605 similarly bans the

unauthorized publishing of the contents of communications received or transmitted 'by wire or

radio,' including satellite transmissions.  *Id.* (citing 47 U.S.C. § 605(a); *DIRECTV, Inc. v. Robson*,

420 F.3d 532, 537–38 (5th Cir. 2005)).  Simply put, "§ 553 covers communications traveling over

cable wire," and § 605 "deals with communications traveling through the air."  *J & J Sports Prods.,*

*Inc. v. River Park Sports Bar, Inc*., No. CV H-15-2638, 2016 WL 6398491, at *2 (S.D. Tex. Oct.

---

[9] To hold otherwise would create an absurd result.  *See Century Sur. Co. v. Casino W., Inc.*, 677 F.3d 903, 908 (9th Cir. 2012) (stating that under Nevada law, a contract "should not be construed so as to lead to an absurd result" (quoting *Reno Club v. Young Inv. Co*., 182 P.2d 1011, 1017 (Nev. 1947))).  That is, if the Event included only the fights, Plaintiff could only enforce its rights to exhibit the Bout and accompanying undercard matches.  It would be Mayweather Promotions, LLC's duty to enforce the rights to exhibit the rest of the broadcast.  Then, a pirate could play the commentary between each fight—without showing the fights themselves—and not be liable to Plaintiff for violating the Communications Act.  Such a result would be absurd and could not have been intended by the parties.

28, 2016) (citing *J&J Sports Prods., Inc. v. Mandell Family Ventures, LLC*, 751 F.3d 346, 353–54 (5th Cir. 2014)).

19.     The Communications Act is a strict liability statute.  *J&J Sports Prods., Inc. v. Allen*, No. 9:13-CV-105, 2014 WL 12567151, at *6 (E.D. Tex. June 27, 2014), *report and recommendation adopted*, No. 9:13-CV-105, 2014 WL 12573953 (E.D. Tex. July 17, 2014).  To prove a violation under § 553, Plaintiff must establish by a preponderance of the evidence that Defendant: (1) intercepted, received, or assisted in intercepting or receiving a communication service offered over a cable system (2) without authorization.  47 U.S.C. § 553(a).  Furthermore, to establish that Defendant violated § 605, Plaintiff has the burden to prove that Defendant (1) received, assisted in receiving, transmitted, or assisted in transmitting an interstate communication by wire or radio and (2) broadcast, displayed, or divulged that communication to (3) at least one other person (4) without authorization.  *Allen*, 2014 WL 12567151, at *6 (citing *Joe Hand Promotions, Inc. v. Tin Cup Sports Bar, Inc*., No. 11-01929, 2012 WL 2572504, at *6 (S.D. Tex. June 28, 2012)).  While Plaintiff asserts that Defendant violated both §§ 553 and 605, "recovery 'is generally not available under both provisions.'"  *Allen*, 2014 WL 12567151, at *8 (citing *Entm't by J&J, Inc. v. Al-Waha Enters., Inc*., 219 F. Supp. 2d 769, 775 (S.D. Tex. 2002)); *see also J&J Sports Prods., Inc. v. Gonzales*, No. SA-14-CV-0809-DAE, 2015 WL 13804011, at *3 n.2 (W.D. Tex. Mar. 11, 2015) (citations omitted) (stating that the "plaintiff may recover damages only under one" section of the Communications Act), *report and recommendation adopted sub nom. J&J Sports Prods., Inc. v. Palacios Gonzales*, No. 5:14-CV-809-DAE, 2015 WL 13804010 (W.D. Tex. Mar. 31, 2015).  Accordingly, the Court must first determine whether § 553 or § 605 applies.  *See Enola Invs., L.L.C.*, 795 F. App'x at 315 (stating that before determining

liability under § 553 or § 605, the district court had to determine what method was used to broadcast the program).

20.     The Court finds that § 553 applies in this case.  Specifically, the evidence shows that the Establishment uses a cable service and that cable service was provided to the television airing the Broadcast through a coaxial cable.  *See J & J Sports Prods., Inc. v. Giuseppe's Bistro, LLC*, No. 14-1326, 2015 WL 1540364, at *2 (E.D. La. Apr. 6, 2015) (holding that the applicable statute is § 553 because the defendant "uses only cable service"); *cf. Joe Hand Promotions, Inc. v. Behind the Fence, LLC*, No. CV 16-00196, 2017 WL 1497630, at *5 (W.D. La. Apr. 6, 2017) (citation omitted) (holding that because the plaintiff's private investigator observed a cable box near the television, § 553 applied), *report and recommendation adopted*, No. CV 16-00196, 2017 WL 1498521 (W.D. La. Apr. 24, 2017).  Moreover, there is no evidence that Defendant had a satellite or otherwise used a satellite provider to intercept the Broadcast.  *See Giuseppe's Bistro, LLC*, 2015 WL 1540364, at *2 (stating that "[b]ecause there is no substantiated allegation that the defendants used a satellite signal to intercept the program, § 605 is inapplicable").  Because "§ 553 covers communications traveling over cable wire," and the only evidence at trial shows that Defendant used cable, the Court finds that § 553 applies here.  *River Park Sports Bar, Inc.*, 2016 WL 6398491, at *2.

21.     The Court next determines whether Defendant violated § 553 of the Communications Act.  Here, the Court finds that Plaintiff proved by a preponderance of the evidence that (1) Defendant received part of the Broadcast over a cable system, via cable wire; and (2) he obtained the Broadcast without authorization from Plaintiff.  The Court therefore finds that Defendant violated § 553.[10]

---

[10] Plaintiff also sues Defendant in his individual capacity.  Therefore, Plaintiff "must show that Defendant had a right and ability to supervise the violations, as well as an obvious and direct financial interest in the misconduct."  *Allen*,

22.     Because Plaintiff has established that Defendant violated § 553, Plaintiff is entitled to recovery.  Under § 553, a plaintiff "may obtain injunctive relief, damages, and attorney's fees and costs." *Prostar v. Massachi*, 239 F.3d 669, 673–74 (5th Cir. 2001).  As for damages, § 553 contemplates the award of either (1) actual damages suffered by the plaintiff; or (2) statutory damages.  *Id.* at 674 (citing 47 U.S.C. § 553(c)(3)(A)(ii)).  Here, Plaintiff has elected to pursue statutory damages and has asked for attorneys' fees (Dkt. #49 at p. 11).  The Court will discuss each in turn.

23.     For a violation of § 553, the Court may award "statutory damages of an amount not less than $250 and not more than $10,000, 'as the court considers just.'"  *Id.*  The Court also has the discretion "to increase the actual or statutory damages to up to $50,000 where willful violations are present."  *Id.* (citing 47 U.S.C. § 553(c)(3)(B)).  "Conversely, the court may reduce damages to not less than $100 where "the violator was not aware and had no reason to believe that his acts constituted a violation of this section."  *Id.* (citing 47 U.S.C. § 553(c)(3)(C)); *see also Joe Hand Promotions v. D.M.B. Ventures, Inc.*, No. CIV.A. 93-2656, 1995 WL 328399, at *8 (E.D. La. May 31, 1995) (citation omitted) (declining to reduce damages because the violator did not contend that it was unaware of the law or that it did not know its actions were illegal).

24.     Plaintiff seeks $10,000, the maximum amount of statutory damages for violating § 553.  The Court has the discretion to "impose the minimum statutory damages available" under § 553 "or some amount between the minimum and maximum, as supported by the evidence."  *Top Rank, Inc. v. Gutierrez*, No. SA-99-CA-880-WWJ, 2001 WL 1018402, at *6 (W.D. Tex. July 31,

---

2014 WL 12567151, at *7 (quoting *Joe Hand Promotions, Inc. v. Adame*, No. EP-12-CV-141-KC, 2012 WL 3561367, at *4 (W.D. Tex. Aug. 16, 2012).  Here, Defendant stipulated that he had the right and ability to supervise the Establishment when the violation occurred and that he had a financial interest in the misconduct in the Establishment's activities on May 2, 2015.  The Court therefore finds that Defendant, both individually and doing business as the Establishment, is liable for the violation of § 553.

2001).  Courts use various methods to determine what statutory amount is just.  *J&J Sports Prods., Inc. v. Santos*, No. DR-17-CV-0028-AM-CW, 2018 WL 1887294, at *3 (W.D. Tex. Feb. 20, 2018).  Courts have calculated damages based on a flat sum, the number of patrons at the time of the violation, and the cost for the licensing fee for the telecast—sometimes even tripling the fee. *Id*.  In determining damages, the Court also considers the purpose of the Communications Act— to deter parties from pirating future broadcasts.  *See J&J Sports Prods., Inc. v. Fifth Club, Inc.*, No. AU-17-CV-00891-SS, 2019 WL 1715172, at *3–5 (W.D. Tex. Apr. 17, 2019) (stating that "the Communication Act was intended to 'proscribe the piracy of programming signals'" and considering that purpose in assessing damages (quoting *United States v. Harrell*, 983 F.2d 36, 39 (5th Cir. 1993))).

        25.    Here, the Court finds that an award of $250 is just.  The evidence before the Court establishes that the pre-fight commentary was played at the Establishment.  While common sense would show that the Bout was likely aired at the Establishment, there is nothing in the record that would support such a finding.  Moreover, there is no evidence that Defendant or his employees, Douglas and/or Zemlicka, put the Broadcast on.  While the Court recognizes that Defendant is responsible for monitoring the content played on the televisions at the Establishment, there is no evidence that Defendant, himself, acted to pirate the Broadcast.  Indeed, there is no evidence as to who put the Broadcast on, and the Court may only speculate as to that answer.[11]   Under these circumstances, a lesser amount of damages is necessary to deter future pirating by Defendant.  The Court therefore determines that Defendant is liable to Plaintiff for his unauthorized exhibition of the Broadcast in the amount of $250.

---

[11] Despite this, the Court may still find that Defendant is liable under § 553 even though the precise means used to accomplish the piracy is undetermined.  *Cf. J&J Sports Prods., Inc. v. Brady*, 672 F. App'x 798, 802–03 (10th Cir. 2016) (stating that § 605 of the Communications Act "does not require identification of the precise means used to accomplish the piracy of a satellite signal).

26.     In addition to statutory damages, Plaintiff seeks an additional $50,000 in damages for a willful violation of § 553.  "Conduct is willful if it is marked by a careless 'disregard for the governing statute and an indifference to its requirements.'"  *Allen*, 2014 WL 12567151, at *8 (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 127 (1985)).  Such conduct must not only be willful, but it must also "be for purposes of direct or indirect commercial advantage or private financial gain."  *Id.* (citation omitted).  In determining whether the defendant acted for the purpose of financial gain, one court in this district noted:

> When there is no evidence proving there was a cover charge for admission to the bar, no promotional advertisements of the Event, and no premium charges for food or drinks, courts have held there is no evidence to support plaintiffs' conclusions that defendants exhibited a certain event for the purpose of financial gain. Additionally, the fact that a bar is not filled to capacity and there is a lack of any evidence indicating that [the d]efendant engaged in a pattern of violations does not warrant a higher penalty under the statute.

*Id.* (citations omitted).

27.     Even assuming that Defendant acted willfully, Plaintiff failed to prove that Defendant's conduct was for the purposes of commercial advantage or financial gain.  Indeed, none of the considerations contemplated by courts weigh in favor of enhancing damages.  There was no cover charge for admission, and there were no advertisements for the Broadcast.  There is also no evidence that Defendant imposed any premium charges at the Establishment for food or drinks during the Broadcast.  Rather, because Defendant made one-third less revenue on May 2, 2015, than he did on the two previous Saturdays, evidence supports a finding that a premium was not imposed.  Additionally, the Establishment was nowhere near being filled to capacity.  Only three patrons were at the Establishment, even though the bar could hold fifty people.  Lastly, there is no evidence that Defendant was a repeat offender of the Communications Act.  These

considerations all weigh against enhanced damages; consequently, the Court will not award them in this case.

28.     Plaintiff also seeks attorneys' fees and costs for the prosecution of this lawsuit. Under § 553, the Court *may* award reasonable attorneys' fees to the prevailing party; such an award is not mandatory, however, and is left to the Court's discretion.  47 U.S.C. § 553(c)(2) (stating that the court may award attorney fees to the prevailing party); *Behind the Fence, LLC*, 2017 WL 1497630, at *5 (citation omitted) (stating that the award of attorneys' fees under § 553 is "not mandatory . . . but is left to the discretion of the court").

29.     Given that the purpose of the Communications Act is to deter piracy and, as stated, such a large award is not necessary to accomplish that goal here, the Court declines to award attorneys' fees.

30.     Plaintiff also seeks attorneys' fees for post-trial and appellate proceedings (Dkt. #49 at p. 15).  As these proceedings have not yet occurred, this issue will be better addressed in the future.  *J&J Sports Prods., Inc. v. Cardenas*, No. CV SA-14-CA-404-DAE, 2014 WL 12877277, at *3 (W.D. Tex. Aug. 5, 2014), *report and recommendation adopted sub nom. J&J Sport Prods., Inc. v. Cardenas*, No. SA-14-CV-404-DAE, 2014 WL 12877276 (W.D. Tex. Aug. 28, 2014).  Thus, if further proceedings are required, Plaintiff may renew its request for attorneys' fees for post-judgment proceedings.  *Id.*

## CONCLUSION

It is therefore **ORDERED** that Defendant James E. Kirkpatrick, individually and d/b/a Anchor Up, Anchor Up Club, Anchor's Up Bar, and Anchor Up Island Shuttle, is liable to Plaintiff in the amount of $250 pursuant to 47 U.S.C. § 553(c)(3)(A)(ii).

**SIGNED this 11th day of September, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE